IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| KENNETH D. BELL, in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com,<br><br>Plaintiff,<br><br>vs.<br><br>USHBB, INC., JAMES A. MOORE, OSCAR H. BROWN, and ROBERT MECHAM,<br><br>Defendants. | No. 3:15-cv-137 |

## COMPLAINT

Kenneth D. Bell (the "Receiver"), as Receiver for Rex Venture Group, LLC ("RVG") d/b/a www.ZeekRewards.com ("ZeekRewards" or "Zeek"), alleges as follows:

## SUMMARY OF CLAIMS

1. From January 2011 until August 2012, RVG operated a massive Ponzi and pyramid scheme through ZeekRewards, an internet based so-called "MLM" (multi-level marketing) program. USHBB, Inc. ("USHBB"), James A. Moore, Oscar H. Brown, and Robert Mecham profited from their role in promoting and sustaining the scheme, collectively receiving more than $1.5 million from RVG. This lawsuit is one of several steps the Receiver is taking pursuant to his court-ordered duties to the Receivership Estate to recover fraudulent transfers and damages for the harms incurred by RVG.

2. By virtue of their knowledge of RVG and ZeekRewards and their prior experience with Ponzi schemes, Defendants knew or should have known that RVG was perpetrating an

unlawful program which involved a Ponzi scheme, pyramid scheme, and/or an unregistered investment contract. In fact, Defendants had previously been involved with a different Ponzi scheme and another collapsed MLM scheme. Despite this knowledge and experience, Defendants created so-called "marketing videos" and other materials for ZeekRewards and otherwise assisted in promoting the unlawful scheme. USHBB and its principals are liable to repay the Receiver the more than $675,000 they received from RVG. Moreover, the Defendants are liable for the considerable damage they caused to RVG by aiding and abetting the ZeekRewards Insiders' breaches of their fiduciary duties and deepening RVG's insolvency.

3. Further, each of the non-corporate Defendants in this action won in excess of $100,000 through ZeekRewards affiliate usernames (either individually or together with another family member or through shell corporations). Because these Defendants "won" (the victims') money in an unlawful combined Ponzi and pyramid scheme, they are not permitted to keep the money and must return these fraudulently transferred winnings back to the Receiver for distribution to Zeek's victims.

## THE PARTIES

### The Receiver

4. Kenneth D. Bell is the Receiver appointed by this Court in *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks*, Civil Action No. 3:12 cv 519 (the "SEC Action") for and over the assets, rights, and all other interests of the estate of Rex Venture Group, LLC, d/b/a ZeekRewards.com and its subsidiaries and any businesses or business names under which it does business (the "Receivership Entities").

### The Receivership Entity

5. The primary Receivership Entity, Rex Venture Group, LLC, is a Nevada limited liability company with its former principal place of business in Lexington, North Carolina. RVG

wholly owned and operated ZeekRewards, an internet website (www.zeekrewards.com) with a physical location for operations in Lexington, North Carolina, and internet customers and contacts in this judicial district and throughout the United States and internationally. RVG also owned and operated Zeekler.com, an online auction business.

## The Defendants

6. USHBB, Inc. ("USHBB") is, upon information and belief, an Indiana corporation with its principal place of business located at 8629 Fawn Lake Circle, Indianapolis, IN 46278. USHBB may be served with process upon its registered agent, James A. Moore, at 8629 Fawn Lake Circle, Indianapolis, IN 46278. USHBB and the individual defendants received $676,848.00 from RVG for their assistance in furtherance of the ZeekRewards scheme. In addition, upon information and belief, USHBB was used by Defendant Brown to obtain "net winnings" in the amount of $168,642.70 from ZeekRewards under the username "ushbb."

7. James A. Moore is, upon information and belief, a resident of Indianapolis, Indiana. He is the president and incorporator of USHBB and a former ZeekRewards "affiliate" who was a "net winner" of at least $109,130.64 under multiple usernames, including "geniweb" and "ttm".

8. Robert Mecham is, upon information and belief, a resident of Bountiful, Utah. He is a vice president of USHBB and a former ZeekRewards "affiliate" who was a "net winner" of at least $868,542.17 through his shell companies Five Star Marketing, LLC and The End Media, LLC, under multiple usernames, including "napier2" and "theend." In addition, Mecham received a $25,000 transfer from an RVG insider in August 2012.

9. Oscar H. Brown, also known as O.H. Brown, is, upon information and belief, a resident of Mount Pleasant, South Carolina. He is a vice president of USHBB and, upon information and belief, a former employee of ZeekRewards. Brown is a former ZeekRewards

"affiliate" who was a "net winner" of at least $168,642.70 and used USHBB to receive at least some of these funds under one or more usernames, including "ushbb." In addition, Brown received a $25,000 transfer from an RVG insider in August 2012.

## JURISDICTION, VENUE AND STANDING

10. On August 17, 2012, the Securities and Exchange Commission filed the SEC Action in this Court pursuant to Sections 20(b), 20(d)(1) and/or 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e) and/or 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), 78u(e) & 78aa] to halt the ZeekRewards Ponzi and pyramid scheme, freeze RVG's assets, and seek the appointment of a receiver for RVG.

11. On the same date, in an Agreed Order Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC (the "Agreed Order"), this Court authorized and directed Mr. Bell as RVG's Receiver to institute actions and legal proceedings seeking the avoidance of fraudulent transfers, disgorgement of profits, imposition of constructive trusts and any other legal and equitable relief that the Receiver deems necessary and appropriate to preserve and recover RVG's assets for the benefit of the Receivership Estate.

12. Within 10 days of his reappointment on December 4, 2012, the Receiver filed the original Complaint and Agreed Order in the SEC Action in all of the United States District Courts pursuant to 28 U.S.C. § 754 giving this Court jurisdiction over RVG's property in every federal district.

13. As an action brought by the Receiver in furtherance of his appointment and in the performance of his duties as directed by this Court, this action is within the ancillary jurisdiction of this Court.

14. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

15. This action is also within the ancillary jurisdiction of this Court because this action concerns RVG's property and assets, which are now under this Court's exclusive jurisdiction.

16. This Court has subject matter jurisdiction over this matter pursuant to its common law ancillary jurisdiction as set forth above.

17. Also, this Court has subject matter jurisdiction under 28 U.S.C. § 1367 because this action is directly related to the claims in the SEC Action, concerns property within this Court's exclusive control and/or is in furtherance of the duties given to the Receiver by this Court.

18. This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 754 and 28 U.S.C. § 1692.

19. This Court also has personal jurisdiction over the Defendants pursuant to N.C. Gen. Stat. §1-75.4 because, *inter alia*, these Defendants provided alleged services to RVG, which operated in North Carolina, and they received payments from RVG through its banks located in North Carolina. By assisting the operation of the ZeekRewards scheme, including numerous communications with RVG and/or meetings in North Carolina, the Defendants created a substantial connection to North Carolina such that the exercise of personal jurisdiction over them is fair and just.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts and transfers alleged herein, as well as the harm sustained because

of Defendants' actions and omissions, occurred in this District. Defendants provided alleged services to RVG in North Carolina, and these alleged services directed at North Carolina gave rise to the causes of action asserted below.

21. The Receiver has standing to bring the claims made in this action pursuant to his authority and the direction of this Court.

22. Pursuant to the Agreed Order, the Receiver has obtained the permission of this Court to file this action.

**FACTUAL BACKGROUND**
*The ZeekRewards Scheme*

23. Beginning at least as far back as 1997, Paul Burks, RVG's owner and lead executive, operated a number of generally unsuccessful multi-level marketing businesses through Rex Venture Group, LLC (and related entities).

24. Dawn Wright-Olivares was RVG's Chief Operating Officer and the Chief Marketing Officer of ZeekRewards. Together with Burks, Wright-Olivares developed the ZeekRewards scheme.

25. Other key employees of RVG included Daniel ("Danny") Olivares, Wright-Olivares' stepson who was responsible for designing and running RVG's websites and databases with Burks; Alexandre ("Alex") de Brantes, Wright-Olivares' then-fiancée who had the title of Executive Director of Training and Support Services; Roger Plyler, who handled "affiliate relations"; and Darryle Douglas, who was a member of RVG's senior-level management. Collectively, these individuals may be referred to as RVG's "Insiders."

26. In 2010, RVG launched Zeekler.com, a so-called "penny auction" website where items ranging from personal electronics to cash were auctioned to bidders.

6

27. A "penny auction" does not work like a typical auction. In a normal auction, it costs nothing to bid, and the auction price rises based on the amount of the bid until there is no higher bid or the amount of time set for the auction expires. In a "penny auction," bids must be *purchased* by bidders, and each incremental bid placed raises the amount of the total price of the auction item only by $0.01. The winner pays the final auction price (plus the cost of bids used), which is theoretically well below the retail price. However, the unsuccessful bidders lose all the money they spent to purchase bids.

28. During 2010, the Zeekler penny auctions were not very successful, but RVG's fortunes changed in 2011. In January 2011, RVG launched a new money-making scheme – ZeekRewards. RVG promoted ZeekRewards as Zeekler.com's "private, invitation-only affiliate advertising division." In reality, ZeekRewards was just a multi-level marketing scheme grafted onto the Zeekler business. It falsely purported to pay a portion of the profits from the Zeekler penny auction business to participants who earned bid balances or points, primarily by buying auction bids. Also, participants in ZeekRewards, often called "Affiliates," were paid for recruiting other participants in a pyramid "multi-level" sales format.

29. The financial essence of the scheme – to buy bids to get a profit share and get paid for recruiting others to the scheme – was or should have been clear to the Defendants. From the beginning, RVG intended to use "bids" in ZeekRewards not as a product but as a proxy for money deposited into the program. Dawn Wright-Olivares was very clear about the plan, telling Danny Olivares on January 21, 2011: "We're just going to use bids as currency." On another occasion, Dawn Wright-Olivares referred to the compounding bids as "Monopoly money."

30. ZeekRewards emphasized that the offer to pay Affiliates for purchasing compounding / sample / VIP "bids" distinguished those bids from the simple purchase of retail

7

bids to participate in the Zeekler auctions. In the "About us" section of the ZeekRewards website, the company wrote: "PLEASE NOTE: To qualify for the 125% reward points you MUST buy the bids in the ZeekRewards back office. Bids purchased on the Zeekler Penny Auction site are 'retail customer' bids and do not qualify."

31. Further, ZeekRewards stated that even though bids bought through ZeekRewards could be used in the auctions, that fact was irrelevant to the multi-level marketing scheme. Affiliates were told that using the bids in the auction would have no effect on their all-important bid or points balance ("Each time you buy a Compounding Bid in your ZeekRewards Back Office a bid is added to the Compounding bucket. *Spending the bid in an auction does not remove it from the bucket*.") (emphasis added).

32. As one Affiliate told Burks, "I know how the system works mathematically and you know I know. Whether you call the bids bids or hamburgers makes no difference. People are not joining Zeek to get hamburgers, or auction bids; they are joining Zeek to make money…."

33. Not surprisingly, relatively few ZeekRewards non-retail bids were used in the Zeekler auctions. Prior to shutdown, RVG estimated that only approximately 19 million VIP bids were used in auctions out of over 7 billion VIP bids sold to Affiliates – less than 1/3 of 1%.

34. The ZeekRewards scheme, rather than the penny auction site, was the source of nearly all the company's income. Relative to ZeekRewards, little or no money was made in the Zeekler "penny auction" business. According to the ZeekRewards database, ZeekRewards sold approximately $820 million in compounding / sample / VIP bids, but only about $10 million in retail bids were sold.

8

35. The Defendants knew or should have known that insufficient income from the penny auction business was being made to pay the daily "profit share" promised by ZeekRewards. The Defendants further knew or should have known that the money used to fund ZeekRewards' distributions to Affiliates came almost entirely from new participants rather than income from the Zeekler penny auctions.

36. Further, the Defendants knew or should have known that the alleged "profit percentage" was nothing more than a number made up by Burks or one of the other Insiders. Rather than reflecting the typical variances that might be expected in a company's profits, the alleged profits paid in ZeekRewards were remarkably consistent, falling nearly always between 1% and 2% on Monday through Thursday and between .5% and 1% on the weekends, Friday through Sunday.

37. With RVG's and Defendants' knowledge, Affiliates regularly and openly touted the consistent payments in their recruiting of new participants. For example, one leading Affiliate's email footer said: "It has been going like clockwork for over 220 days, 7 days per week.".... "EVERYONE. . .GETS. . .PAID. . .FIRST. . .DAY!" . . . This works every time with just one minute per day! If you're not getting paid every single day for 1 minute of work, . . . [sic] why not?" . . . "100 percent of our active members are paid daily 100 percent of the time within their first 24 hours without any referrals."

38. This fake consistency should have, at a minimum, caused the Defendants to inquire further about the validity of the alleged profits. Indeed, the program publicly advertised historical average returns of 1.4% per day, which no legitimate investment could accomplish. But, the Defendants either knew these claims were false or deliberately turned a blind eye to these incredible claims and chose not to seek further information.

9

39. It was or should have been known to the Defendants that ZeekRewards succeeded because it promoted this lucrative "compensation plan," offering large amounts of passive income to entice individuals to participate in the scheme. Defendants knew that participants in the ZeekRewards scheme invested money in the scheme expecting that they would receive profits from the Zeekler penny auction or other Zeek efforts. Thus, the Defendants knew or should have known that RVG, with their assistance, was promoting an unlawful unregistered security.

40. Finally, the Defendants knew or should have known that the ZeekRewards compensation plan was paying Affiliates to recruit other Affiliates in an unlawful pyramid-style payment system. ZeekRewards openly referred to this system as the "Matrix."

41. The Matrix pyramid was initially a "2x21" matrix in which Affiliates made multi-level marketing commissions for 21 levels down in their "organization." Later, ZeekRewards used a "2x5 forced-fill matrix," which is a pyramid with 63 positions that paid a bonus to Affiliates for every "downline" investor within each affiliate's first five levels, plus a "matching bonus" for every subsequent 5th level where certain qualifiers were met; so in effect, the commissions could be earned indefinitely.

42. To get bonuses through the Matrix, Affiliates just had to (1) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; and (2) recruit at least two other "Preferred Customers" (i.e., investors who also enrolled in a monthly subscription plan). Once qualified, Affiliates earned bonuses and commissions for every paid subscription within their "downline" pyramid, whether or not they personally recruited everyone within the matrix.

43. Simply put, the Defendants knew or should have known that affiliates were rewarded merely for recruiting new investors without regard to any efforts by the Affiliates to sell bids or products or otherwise materially support the Zeekler retail business.

*The Defendants' Role in the Scheme*

44. Upon information and belief, the Defendants have previously provided assistance to suspect schemes, including the Ad Surf Daily Ponzi scheme and one or more other failed MLM operations.

45. Consistent with this dubious track record, the Defendants assisted the ZeekRewards scheme by creating multiple videos that served as promotional tools for ZeekRewards. Upon information and belief, these videos included the titles "One Penny Billionaire," "You Get Paid to Advertise," "Got 20 Seconds," "The Dog Gone Truth," and "Spin the Wheel."

46. The videos were carefully produced to mislead and deceive victims into participating in the scheme, convincing victims that with minimal effort they could earn significant financial returns from the Zeek scheme.

47. These videos assisted the Insiders in promoting the alleged ease with which affiliates could earn passive profits by investing in the scheme and selling membership in the scheme to others. Affiliates were told to mention the ZeekRewards program to a prospective affiliate or advertise it on a web page, and then email or otherwise provide them a link to the USHBB videos, which upon information and belief convinced other unwary victims to sign on.

48. The videos were a key component in proliferating the RVG Ponzi scheme, causing significantly more victims and financial loss than otherwise would have occurred absent Defendants' actions.

11

49. USHBB directly promoted their videos to Affiliates. For example, in June 2012, upon information and belief, Defendant Mecham personally promoted the USHBB "video system" to Affiliates at a ZeekRewards "Red Carpet" event in Lexington, NC.

50. Further, the Defendants were involved in the Zeek scheme's operation and the Insiders' decisionmaking. For example, in August 2011, ZeekRewards adjusted some of the terminology it used publicly in an attempt to disguise the "Compounder" as a legitimate retail profit sharing mechanism. The Compounder's name was changed to the "Retail Profit Pool," but the substance of this investment vehicle did not change. USHBB was or should have been fully aware of this deceitfulness in which it participated. In a June 24, 2011 email, Dawn Wright-Olivares wrote to O.H. Brown regarding a webinar that USHBB had created for Zeek: "I started to do minor edits . . . ([Y]ou'll see them where I started to say Retail Profit Pool) lol instead of Compounder . . . ." She further wrote to Brown: "the silent cap [for bid expiration] reality will be 125% but we can't SAY it as you know."

51. Moreover, USHBB was in close communication with the Insiders and knew or should have known the scheme was unlawful. Upon information and belief, O.H. Brown wrote to Dawn Wright-Olivares in June 2012: "Heads up!!!! Our IT partners, RMR development received a telephone call from the SEC today regarding yougetpaidtoadvertise and what organizations were associated. This was a very short call I am told. Not sure what will come of this but this is an alarm at least that the government is looking. We need to get squeaky clean and quick!"

52. Finally, on August 9, 2012, when the scheme's end was imminent, Defendants Mecham and Brown each received an unexplained transfer of $25,000 from an RVG Insider.

These transfers were in addition to their significant net winnings and the $676,848.00 that they received along with or through USHBB from RVG.

53. The effect and harm caused by the Defendants' actions on commerce was to magnify the number of ZeekRewards victims, the financial harm to these individuals, and the overall loss to the financial system.

54. Defendants Moore, Brown, and Mecham are members of the Net Winner defendant class in *Bell v. Disner et al.*, No. 3:12-cv-519 (W.D.N.C. filed Feb. 28, 2014) because they won the substantial amounts described above in the ZeekRewards scheme. As set forth in that action, the Net Winner class members are liable to fully repay their ZeekRewards net winnings with interest. The relief sought in this action is in addition to the obligation to repay those net winnings, which are already being sought as relief in the *Bell v. Disner* action.

## FIRST CLAIM FOR RELIEF

**Fraudulent Transfer of RVG Funds in Violation of
the North Carolina Uniform Fraudulent Transfer Act**

55. The Receiver realleges and incorporates by reference the foregoing paragraphs.

56. As described above, in the course of operating the ZeekRewards scheme, Burks and others – through RVG – made numerous payments to the Defendants in addition to their net winnings in the ZeekRewards scheme for their assistance in providing videos and other support to enhance and expand the scheme. These payments, which totaled at least $725,000, are collectively referred to as the "Transfers."

57. The Transfers were made within four years before the date of this action.

58. Each of the Transfers constitutes a "transfer" of an asset or an interest in an asset within the meaning of N.C. Gen. Stat. §39-23.1(12).

13

59. All of the Transfers occurred during the course of a Ponzi and/or pyramid scheme, when participant money was commingled and the Receivership Entities were effectively insolvent.

60. Each of the Transfers was to, or for the benefit of, one or more of the Defendants.

61. Each of the Transfers was made with money misappropriated from one or more of the Receivership Entities. At all times relevant herein, the Receivership Entities had a claim to the funds used for the Transfers.

62. Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants. Specifically, the video system and marketing materials provided by Defendants to RVG provided no value, and only served to expand the Ponzi and pyramid scheme, causing far more victims and harm to the financial markets than otherwise would have occurred had they not provided these materials.

63. Moreover, the Defendants did not act in good faith in obtaining the Transfers from RVG.

64. Each of the Transfers was made by Burks and others to further the Ponzi and/or pyramid scheme and was made with the actual intent to hinder, delay or defraud some or all of the Receivership Entities' then existing creditors.

65. In the alternative, at the time of each of the Transfers, the Receivership Entities were insolvent or became insolvent as a result of the Transfer; were engaged in a business or transaction, or were about to engage in a business or transaction, for which the remaining assets of the Receivership Entities were unreasonably small in relation to the business or transaction; or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts became due.

14

Case 3:15-cv-00137-GCM   Document 1   Filed 03/26/15   Page 14 of 20

66. The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to N.C. Gen. Stat. §39-23.4(a)(1), N.C. Gen. Stat. §39-23.4(a)(2) or N.C. Gen. Stat. §39-23.5 and recoverable from the Defendants pursuant to N.C. Gen. Stat. §39-23.7 and N.C. Gen. Stat. §39-23.8.

67. Pursuant to N.C. Gen. Stat. §39-23.4(a)(1), N.C. Gen. Stat. §39-23.7, N.C. Gen. Stat. §39-23.8 and 28 U.S.C. §2201, the Receiver is entitled to a Judgment: (1) avoiding the Transfers; and (2) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

**SECOND CLAIM FOR RELIEF**
**Common Law Fraudulent Transfer**

68. The Receiver realleges and incorporates by reference the foregoing paragraphs.

69. The Transfers were made within three years before the date of this action.

70. Each of the Transfers constitutes a transfer of an asset or an interest in an asset of the Receivership Entities.

71. All of the Transfers occurred during the course of a Ponzi and/or pyramid scheme, when participant money was commingled and the Receivership Entities were insolvent.

72. Each of the Transfers was to, or for the benefit of, one or more of the Defendants.

73. Each of the Transfers was made with money misappropriated from one or more of the Receivership Entities. At all times relevant herein, the Receivership Entities had a claim to the funds used for the Transfers.

74. Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

75. At the time of each of the Transfers, the Receivership Entities were insolvent, or became insolvent, as a result of the Transfer.

15

76. The Transfers constitute fraudulent transfers avoidable by the Receiver and recoverable from the Defendants.

77. Accordingly, pursuant to 28 U.S.C. §2201, the Receiver is entitled to a Judgment: (1) avoiding the Transfers; and (2) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Breach of Fiduciary Duty

78. The Receiver realleges and incorporates by reference the foregoing paragraphs.

79. Burks and the other RVG Insiders owed fiduciary duties to RVG.

80. These Insiders failed to act in good faith and with due regard to RVG's interests when they knowingly operated an unlawful compensation plan and caused hundreds of millions of dollars of damages to RVG.

81. Defendants had knowledge of the Insiders' breaches of their fiduciary duties to RVG.

82. Defendants, knowing that their conduct alleged herein served to aid or abet the Insiders' breaches, substantially assisted the Insiders in their breaches of fiduciary duty.

83. Defendants knew or should have known that their aiding, abetting, or participation in these breaches of fiduciary duties would result in significant harm to RVG.

84. These breaches of the fiduciary relationship and Defendants' substantial assistance in the breaches have directly and proximately caused substantial harm to RVG, including, but not limited to, RVG's deepened insolvency and the financial claims of the victims of the Zeek Ponzi and/or pyramid scheme against RVG.

85. RVG is entitled to recover from the Defendants the amount of damages proximately caused by their conduct in an amount to be proven at trial.

86. The Defendants' substantial assistance to these breaches of fiduciary duties was willful, wanton, and outrageous, and RVG is entitled to an award of punitive damages against the Defendants to deter such conduct in the future.

**FOURTH CLAIM FOR RELIEF**

**Unfair and Deceptive Trade Practices – N.C. Gen. Stat. § 75.1-1 *et seq*.**

87. The Receiver realleges and incorporates by reference the foregoing paragraphs.

88. The actions of the Defendants, including their assistance to a Ponzi and/or pyramid scheme, constitute unfair and deceptive acts under N.C.G.S. § 75-1-1.

89. Defendants' conduct was in or affecting commerce in North Carolina.

90. Defendants' actions were unfair and deceptive. The videos possessed the tendency or capacity to mislead, or created the likelihood of deception, convincing victims that with minimal effort they could earn significant financial returns from the Zeek scheme.

91. Moreover, the harm and effect of the Defendants' actions upon commerce was to proliferate the RVG Ponzi scheme, causing significantly more victims and financial loss than otherwise would have occurred absent Defendants' actions.

92. Defendants' actions were immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and/or participants of the Zeek scheme.

93. Defendants' actions directly and proximately caused RVG damages, including but not limited to deepening RVG's insolvency, in an amount to be determined at trial.

94. Defendants' acts of unfair and deceptive trade practices entitle the Receiver to treble damages and attorney fees pursuant to N.C. Gen. Stat §§ 75.1-1(a), 75-16, and 75-16.1.

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment

95. The Receiver realleges and incorporates by reference the foregoing paragraphs.

96. The Defendants each benefited from the receipt of money from the Receivership Entities in the form of alleged compensation and other payments which were the property of the Receivership Entities and for which the Defendants did not adequately compensate RVG or provide value. Indeed, the Defendants' work for RVG caused additional losses by assisting in recruiting victims to the ZeekRewards scheme.

97. The Defendants have unjustly failed to repay RVG for their profit and the excessive benefits they received.

98. The enrichment was at the expense of the Receivership Entities and ultimately at the expense of RVG's creditors / victims.

99. Equity and good conscience require full restitution of the monies received by the Defendants for distribution to RVG's creditors / victims.

100. Accordingly, the Receiver, on behalf of RVG, is entitled to an award of full restitution from the Defendants in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### Constructive Trust

101. The Receiver realleges and incorporates by reference the foregoing paragraphs.

102. As alleged above, the assets of the Receivership Entities have been wrongfully diverted as a result of fraudulent transfers to the Defendants for their individual interests and enrichment.

103. The Receiver has no adequate remedy at law.

104. Because of the fraudulent transfers, the Receiver is entitled to the imposition of a constructive trust with respect to any transfer of funds, assets, or property from the Receivership

Entities, as well as any assets received by Defendants in the past or on a going forward basis as a result of those transfers from the Receivership Entities.

105. The Receiver is entitled to and demands title, possession, use and enjoyment of the foregoing property for the benefit of the Receivership Estate.

## PRAYER FOR RELIEF

WHEREFORE, the Receiver respectfully requests that the Court:

1. Enter Judgment against each of the Defendants jointly and severally for the full amount of the funds they received from RVG as detailed above (other than their net winnings from ZeekRewards for which they are liable as set forth in *Bell v. Disner*) and for all damages and losses suffered by RVG and the Defendants' unjust enrichment in an amount to be determined at trial.

2. Award the Receiver just and reasonable attorney fees, subject to Court approval, which are justified in light of the costs to the Receivership Estate in bringing this action.

3. Award the Receiver treble damages and reasonable attorney fees pursuant to N.C. Gen. Stat §§ 75.1-1(a), 75-16, and 75-16.1.

4. Award prejudgment and post-judgment interest, costs and such other and further relief as the Receiver is entitled to recover.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  March 26, 2015                             Respectfully submitted,


                                                   /s/ Irving M. Brenner
                                                   Kenneth D. Bell, Esq., Receiver
                                                   Irving M. Brenner (NC Bar No. 15483)
                                                   Matthew E. Orso (NC Bar No. 42409)
                                                   McGuireWoods LLP
                                                   201 North Tryon Street, Suite 3000
                                                   Charlotte, North Carolina 28202
                                                   (704) 343-2000
                                                   (704) 373-8836 (fax)
                                                   kbell@mcguirewoods.com
                                                   ibrenner@mcguirewoods.com
                                                   morso@mcguirewoods.com